

# IN THE DISTRICT COURT OF TULSA COUNTY
## STATE OF OKLAHOMA

**DISTRICT COURT FILED**

FEB 1 2 2020

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

| | |
|---|---|
| DAVID GARY SMITH, LORI SMITH, and All Others Similarly Situated, | )<br>)<br>)<br>) |
| Plaintiff(s), | ) Case No. CJ-2020-00460 |
| | )<br>) Honorable Judge Nightingale |
| vs. | )<br>) |
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ATTORNEY'S LIEN CLAIMED<br>)<br>) |
| Defendant(s). | ) |

## FIRST AMENDED
## CLASS ACTION PETITION

Plaintiffs respectfully come before this Court to present their claims for relief against the Defendant for Breach of Contract and Bad Faith. Plaintiffs would respectfully show the Court the following:

### JURISDICTION AND VENUE

1. The claims alleged herein arose out of the Defendant's actions (specified hereinafter) within Tulsa County regarding real property owned by the Plaintiffs in Tulsa County, State of Oklahoma.

2. Plaintiffs reside in the subject real property located in Tulsa County, State of Oklahoma.

3. Defendant American National Property and Casualty Company (ANPAC) is a property and casualty insurance company headquartered in Springfield, Missouri, and is a subsidiary of the American National Insurance Company (ANICO) of Galveston, Texas. ANPAC conducts insurance business in Tulsa County, Oklahoma.

4. Defendant ANPAC is or was at all times pertinent to this action Plaintiffs' homeowners' insurance carrier in Tulsa County.

5. Based on the forgoing information, Plaintiffs believe this Court has jurisdiction over the claims asserted in this action and venue is proper in Tulsa County, Oklahoma.



1

**EXHIBIT 3**

## ALLEGATIONS OF FACT

6. Paragraphs 1 through 5 are incorporated by reference.

7. In 2005 Plaintiffs (persons of ordinary intelligence and without any special knowledge or expertise) purchased a new home in Broken Arrow, OK and purchased homeowners' insurance from ANPAC, which included, among other coverages, full replacement value on the roof of their home. The policy number was in 2005, 35-H-V64-786-2, and still is in 2020.

8. Upon their best memory and a good faith belief, full replacement roof coverage insurance was an upgrade that had to be selected and cost extra money.

9. Payments for the insurance of the home were made directly to ANPAC by Plaintiffs' mortgage company, and at all times pertinent to this action ANPAC was paid in full when payments became due.

10. In June, 2018, Plaintiffs' home suffered storm damage and the roof of their home had to be replaced because of that storm. The DOL was 06/07/2018, and the Claim No. was 35-H-3N4930.

10. To Plaintiffs' surprise and shock, when it was time for ANPAC to pay the bills for their new roof, ANPAC claimed it had, back in 2014, changed Plaintiffs' full roof replacement coverage to cash value insurance coverage. According to ANPAC, this change allowed ANPAC to depreciate the value of the roof due to its age and pay **Far Less** on Plaintiffs' roof damage claim than under full replacement coverage. Plaintiffs were left hanging on the hook for the remaining amounts.

11. This big, important and negative change made to Plaintiffs' insurance policy was made unilaterally by ANPAC. That is, there was:

- No discussion with Plaintiffs.
- No negotiations with Plaintiffs.
- No mutual assent by or with Plaintiffs.
- No intent of the parties to change the policy.
- No consideration paid by ANPAC to Plaintiffs for the reduction in coverage, not even a refund of premiums paid or any noticeable reduction in their premium.

2

- Just a one-sided, unilateral change in a policy by ANPAC that benefited only ANPAC and produced harm and hardship in the Plaintiffs' lives.

12. Therefore, Plaintiffs NEVER agreed to the change, and thus, under all rules governing **Adhesion Contracts**, particularly insurance adhesion contracts, in Oklahoma, the change was/is void and of no effect and the policy's previous terms (which are in Plaintiffs' favor, not ANPAC's) still applied when the storm damage occurred.

12. Concerning this big, important and negative change, ANPAC claims it mailed notice of the change, by regular mail, to Plaintiffs' home when the policy renewed in 2014.

13. Plaintiffs never received that notice and, therefore, under the current state of case law in Oklahoma, the change never went into effect for lack of proper notification to the Plaintiffs. *See, Wynn v. Avemco Insurance Co.*, 1998 OK 75, 963 P.2d 572, 574 (Okla. 1998)("Thus, it is the duty of the insurance company to call attention to any changes in the policy. ... in clear and conspicuous language ...") and *Government Employees Insurance Company v. United States of America*, 400 F.2d 172, 175 (10th Cir. 1968)("It is the general rule that an insurance company is bound by the greater coverage in an earlier policy where the renewal contract is issued without calling the insured's attention to a reduction in policy coverage.").

14. By now, Plaintiffs have received via email from their agent the documents ANPAC claims it mailed by regular mail to them in 2014.

15. Hypothetically, if the Court and/or jury concludes that Plaintiffs did receive those documents back in 2014, Plaintiffs contend the documents and "notice" are deficient and ineffective in communicating the message that ANPAC had taken away and reduced their full replacement roof insurance protection. Thus, any language taking away and reducing their roof coverage was/is void and of no effect for lack of proper notice and ANPAC was/is bound by the greater coverage in Plaintiffs' earlier policy. *See, Government Employees Insurance Company v. United States of America*, at 175 (In addition to the Court's important statement quoted in paragraph 13 above, the Court states here that instructions to the insured to carefully read the new policy as submitted is insufficient to call attention to the change in coverage, and that it is inequitable to require the insured to search the fine print of the renewal policy.).

3

16. The documents and language reducing Plaintiffs' roof insurance coverage is deficient and insufficient and, therefore, void and of no effect (even if received) for the following reasons:

(a) The packet ANPAC sent was 96 pages long. It is not reasonable to expect busy, hardworking, and family raising people to read or even review 96 pages and expect them to comprehend and understand the message that – Your Insurance Company just cheated you by unilaterally making a major change to your policy that REDUCES your roof insurance protection, the coverage you specifically chose to purchase **9 years ago** and have paid for the last **9 years**. No one, at least not ordinarily intelligent people lacking special knowledge or expertise such as Plaintiffs, would ever expect to receive a message like that and it is inequitable to make them search through 96 pages to figure it out. *See, Government Employees Insurance Company v. United States of America*, at 175 ("… it is inequitable to require an insured to search the fine print of each renewal policy, …").

(b) There was nothing special or eye catching or attention grabbing about the notice language ANPAC employed to announce the reduction in Plaintiffs' roof insurance protection. The first mention or indication changes had occurred to the policy was on Page 5 of 96.

(c) The language used to announce changes had occurred to the policy on page 5 was general, not specific in announcing to Plaintiffs -- YOUR ROOF INSURANCE COVERAGE HAS BEEN REDUCED. There's nothing like that in the entire 96 pages and all it says on page 5 is, *"Your new policy includes coverage changes."*

It is unreasonable to think that phrase, in the midst of 96 pages of documents, would catch the attention of busy, hardworking, family raising people. Thus, that was NOT sufficient notice to call Plaintiffs' attention to the fact that a major negative change had been unilaterally made to their policy.

(d) Besides that, the reduction in coverage change to the roof coverage is planted in the middle (actually, lower than the middle) of the page AFTER numerous "Coverage Enhancements" to the policy are set forth.

4

It appears ANPAC intentionally <u>planted</u> the language there to disguise it and to hopefully <u>not</u> catch customers' attention to read it and understand that they just got cheated out of important insurance protection. In doing that, ANPAC retained Plaintiffs' business for the next 4 years and paid them way less on their damaged roof claim in 2018.

(e) Furthermore, the language in the lower middle of that 5th page about roof coverage is ambiguous. It says, "your new policy ... may not cover the full cost to repair or replace your roof ...." "May not" cover means the same thing as "might not" cover.

"Might not cover" does not mean "it will not cover" the full cost to repair your roof. "Might not cover" means "IT MIGHT cover it" just as much as it means it "might not cover it." Thus, the language used is ambiguous. And it was intended to deceive customers rather than to inform and enlighten them of the negative changes to their policy.

(f) The next place any notice of reduced roof coverage language is provided is on page 10 of the 96 page packet, in a section titled, *Policy and Endorsement Coverage Comparisons*. That particular section is numbered 1 of 15 through 15 of 15. On page 10 of 96 (or, page 2 of 15), a fairly clear written notice of reduction in roof coverage is provided. However, it does not satisfy ANPAC's duty to <u>call attention to the change in a clear and conspicuous</u> manner for the following reasons:

(i) It is NOT presented conspicuously, but rather is hidden/disguised in the middle of the 2nd page in the midst of much other information, it is not highlighted, and none of the words are any bigger than any other words on the page. Thus, it is <u>not</u> conspicuous; and

(ii) It is contradicted by, confused by, and/or an ambiguity is created by language on pages 15 and 22 of the 96 page packet (pages 7 of 15 and 14 of 15 of the section).

a. On page 7 of 15 it says – "The new policy now includes replacement cost coverage for dwellings ..." Obviously, all "dwellings" have roofs and roofs are attached to and are part of the dwelling. In fact, a structure cannot be deemed a "dwelling" unless it has a roof. Thus, roofs may be

5

reasonably interpreted to have full replacement cost coverage since "dwellings" have it.

        b. On page 14 of 15, an endorsement (#SH-92506) for Replacement Cost Coverage for Roofs is discussed and made available to customers. Customers, like Plaintiffs, who <u>already</u> had purchased replacement cost roof coverage could easily and reasonably conclude from the endorsement language – *I already have full replacement coverage and have been paying for it, so I'm good here. The wording about not having it does not apply to me because I already pay for this upgraded coverage and have had it since the beginning, for over 9 years by now* (for Plaintiffs 9 years as of 2014, 13 years as of 2018 when they still believed they had it).

    (g)    Additionally, the notice and message that ANPAC gave fails to satisfy the duty it had to call Plaintiffs' attention to the <u>major</u> <u>reduction</u> in their coverage in a clear and conspicuous manner because of another ambiguity created by its "Renewal Declaration" page, which is found on page 35 of the 96 page packet.

        (i)    From that declarations page, it is reasonable to conclude Plaintiffs had the benefit of what is referred to as *Utility Systems, Roof, and Protective Device* coverage. The explanation of that coverage is provided on pages 43-44 of the 96 page packet. On page 44 there is a section titled, "ROOF UPDATE" in bold. That section states: *"Complete replacement or overlay of your **entire** roof by a qualified contractor and installed to meet or exceed local building codes."* And, the word "entire" is in BOLD.

        (ii)    It cannot be questioned that it is reasonable for persons of ordinary intelligence to conclude from that written statement that they have full replacement insurance coverage for their roof, especially in light of the fact Plaintiffs already had it for 9 years prior to 2014 (and thought they had it for 13 years) and there was no significant reduction in their premium in 2014 (nor 2015, 2016, 2017, 2018) to correspond with the <u>major</u> reduction in their roof insurance coverage or otherwise.

        (iii)    By now Plaintiffs have received from their agent, via email, policy documents dated 2015 (62 pages) and 2018 (44 pages). In both packets the same

6

*Utility Systems, Roof, and Protective Device* coverage information is included. Thus, it is reasonable to conclude this information was also included in their 2016 and 2017 policy renewal documents.

17. Additionally, No One from ANPAC, not even Plaintiffs' agent, called, emailed or consulted Plaintiffs as to whether they knew what had happened, understood what had happened and wanted to continue the policy and pay for the Reduced homeowners' insurance coverage or whether they wanted to (once again) select and purchase full replacement roof coverage by purchasing endorsement #SH-92506. No one offered endorsement #SH-92506 to Plaintiffs. No one told them about it.

18. Furthermore, concerning endorsement #SH-92506 and the actions/inactions of ANPAC, it is deceitful and wholly unfair to:

(a) TAKE AWAY full replacement roof coverage from Plaintiffs (and others) who already had it and were paying for it in previous policy years; and

(b) Then, at the same time, to be offering full replacement coverage to customers in an endorsement hidden inside the 96 pages of documents; but

(c) Not specifically, directly and openly contact Plaintiffs to fully inform them of and offer the endorsement coverage to them (again) in order to keep Plaintiffs' insurance protection consistent and ongoing;

(d) It is unreasonable, and not even feasible, to think ANPAC did not know Plaintiffs would most likely want and choose to purchase endorsement #SH-92506 in order to continue to maintain full replacement value insurance protection on the roof of their home. Yet, ANPAC didn't say a word or lift a finger to make certain Plaintiffs knew about it. Truly, this is an astonishing act of complete unfairness and total betrayal by ANPAC to Plaintiffs and all of its customers impacted by the reduction in roof coverage change.

19. Additionally, as mentioned briefly above, ANPAC provided Plaintiffs no consideration whatsoever in order to make such a Major & Unilateral change to their insurance contract. For example, there was no significant reduction in the cost of the insurance policy to correspond with such a Major Reduction in coverage. In fact, from 2014 when the reduction in coverage occurred through 2018 when the storm claim was made, ANPAC actually raised Plaintiffs' premiums a total of $506.00 **rather than lower it to correspond with the Reduced**

7

**Insurance Protection**. *See*, Exhibit 1. Therefore, the unilateral change made to Plaintiffs' insurance contract must fail due to a lack of consideration. Or, at the very least, the lack of corresponding reduction in premium contributed to ANPAC's failure to call Plaintiffs' attention to the negative changes in the policy.

20. Summarizing, instead of being direct, forthright and upfront about it, ANPAC tried to underhandedly force-feed the reduced roof insurance protection upon Plaintiffs by trying to set things up (trying to rig and manipulate the situation) so it could later say, if ever challenged, *oh, yes, we told you about it, and its all here in this **96 pages** of documents we mailed to you back in 2014.*

21. The actions of ANPAC described above were not fair and not honest. Moreover, that is not how insurance companies are required to treat their customers in Oklahpoma. Such actions constitute a Breach of Contract by ANPAC and a Breach of ANPAC's Duty of Good Faith and Fair Dealing.

22. Finally, but not least, ANPAC guilty of another dishonorable act against Plaintiffs in that when it paid Plaintiffs' 2018 storm damages claim it depreciated labor costs for the removal of the debris from Plaintiffs' home. Doing so was contrary to specific terms of the insurance policy contract and contrary to Oklahoma case law. *See*, Exhibit 2 attached hereto.

(a) Page 1 is a page from ANPAC's payment of claim documentation mailed to Plaintiffs with a check. The table or chart clearly shows (see sentence 2 and line #1) ANPAC depreciated the labor costs for debris removal.[1]

(b) Page 2 is a page from Plaintiffs' policy stating ANPAC will pay for debris removal. It says: "We will pay up to an additional 5% of the Coverage ... for the removal of debris ..." For a lesson on how Oklahoma's Supreme Court has dealt with situations like this read, *Branch v. Farmers Ins Co.*, 2002 OK 16, 55 P.3d 1023 (Okla. 2002). This act was yet another Breach of Contract by ANPAC and a Breach of ANPAC's Duty of Good Faith and Fair Dealing.

---

[1] Plaintiffs are not certain at this point what the total amount of depreciation of labor costs for ALL debris removal is that ANPAC took to save itself money, but they are confident they will find out during discovery. It should be noted they believe in good faith other numbered lines must also include some depreciation of labor costs to remove debris. Thus, the total depreciation amount is more than what is shown in line #1.

8

23. To be clear, and in summary, Plaintiffs' have 4 primary complaints against ANPAC:

(a) ANPAC never gave notice to Plaintiffs of the unilateral changes and reductions in coverage it made to their homeowners' policy in 2014. ANPAC claims it mailed to Plaintiffs a packet of 96 pages of documents changing and reducing Plaintiffs' homeowners' roof coverage, but <u>Plaintiffs never received it</u>. Therefore, the policy terms were not changed and Plaintiffs' coverage was not reduced. Still, ANPAC adjusted and "settled" Plaintiffs' 2018 storm damage claim in accordance with the alleged 2014 policy changes anyway. Plaintiffs' contend ANPAC breached the insurance contract and acted in bad faith by doing so.

(b) The 96 pages of documents ANPAC claims it mailed to Plaintiffs in 2014 to change and reduce their homeowners' insurance protection, even if received, were and are defective and deficient in calling Plaintiffs' attention to the alleged changes to their policy. And, therefore, the policy terms were not changed and Plaintiffs' coverage was not reduced. Yet, ANPAC adjusted and "settled" Plaintiffs' 2018 storm damage claim in accordance with the alleged 2014 policy changes anyway. Plaintiffs' contend ANPAC breached the insurance contract and acted in bad faith by doing so.

(c) Contrary to the terms of the 2014 thru 2018 policy, ANPAC wrongfully depreciated the labor costs to remove debris from Plaintiffs' home when it adjusted Plaintiffs' 2018 storm damage claim. Plaintiffs' contend ANPAC breached the insurance contract and acted in bad faith by doing so.

(e) ANPAC's failure to inform Plaintiffs and ensure they fully understood the big and negative change to their insurance coverage appears to have been intentional for the purpose of retaining Plaintiffs' business and being able to pay them less on any future roof claims.

## CLASS DESCRIPTION & ALLEGATIONS

24. Plaintiffs incorporate all preceding allegations and information as if fully set forth herein.

> **Please Note:** Plaintiffs do not intend to ask the Court to certify the class until (a) any dispositive motion filed by Defendant is ruled upon and only if the ruling is in their favor, and (b) information supporting a class action

9

is obtained through discovery. This section is intended to give notice to the Court and Defendant of Plaintiffs' intentions and to reserve the right to amend their Petition later and/or to file a motion to certify the class.

25. This is a civil class action brought on behalf of a plaintiff class consisting of all persons and entities residing in and/or located in the State of Oklahoma, who like Plaintiffs:

(a) Their homeowners' policies were, (i) as described above, unilaterally changed by ANPAC as to the insurance coverage they had for the roofs of their homes or buildings; (ii) and they suffered damage to their roofs by wind, storm or hail; and (iii) and ANPAC adjusted their claims according to the changed policy by paying less than it would have under full replacement coverage.

(b) Made claims for damage to their homes and ANPAC wrongfully depreciated the labor costs for the debris removal from their properties.

26. The Smiths bring this action as a class action against the Defendant pursuant to Rule 12 O.S. §2023 on their own behalf and on behalf of a class consisting of all persons and/or entities described in paragraphs 7 – 22 above.

27. The Smiths are members of the class and they will fairly and adequately assert and protect the interests of the Class. The Smiths' interests are coincident with, and not antagonistic to, those of other members of the Class.

28. The members of the Class are believed to be so numerous that joinder of all members is impracticable. Upon information and belief, there are several hundred members of the Class whose identities can be easily ascertained from the records and files of the Defendant.

29. The Smiths do not anticipate any difficulties in the management of the action as a class action.

30. Common questions of law and fact predominate over any questions affecting only individual members of the Class. Common questions include, *inter alia*, the following:

(a) Whether Plaintiffs' causes of action apply to a class of Plaintiffs;

(b) Whether Plaintiffs' factual allegations are similar to what other members of the class have experienced at the hands of ANPAC;

(c) Whether other ANPAC customers' homeowner policies were unilaterally changed by ANPAC from full replacement roof coverage to a downgraded cash value coverage;

(d) Whether ANPAC gave sufficient notice to ANPAC homeowner policy holders of the change from full replacement roof coverage to a downgraded cash value coverage and paid or provided sufficient consideration for the change;

(e) Whether ANPAC depreciated the labor costs to remove the debris from its insureds' homes on claims made by other ANPAC homeowner policy holders;

31. The prosecution of separate actions by individual members of the class would create a risk of:

(a) Inconsistent or varying adjudications with respect to individual members of the Class; and

(b) Adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

32. Defendant's wrongful and offensive actions are applicable to the entire Class, thereby making final relief with respect to the Class appropriate.

33. A class action is superior to other available methods for the fair and efficient prosecution of this action. The certification of a class would allow litigation of claims that, in view of the expense of the litigation, may be insufficient in amount to support separate actions.

34. Accordingly, Plaintiffs bring this action on behalf of themselves and all members of the Class described above and respectfully request the Court to certify it.

## FIRST CLAIM FOR RELIEF
Breach of Insurance Contract

35. Plaintiffs incorporate all preceding allegations and information as if fully set forth herein.

36. In 2005 Plaintiffs purchased a contract of insurance from ANPAC on their home that included (a) full replacement roof insurance coverage at a set and agreed upon price, and (b) the removal of debris from their home without depreciation of the labor costs.

37. When ANPAC unilaterally changed Plaintiffs' insurance contract in 2014 from full replacement value roof coverage to cash value replacement coverage (a) without providing sufficient notice to Plaintiffs to call their attention to the changes, (b) without offering Plaintiffs the opportunity to choose (once again) to obtain full replacement coverage insurance under

ANPAC's endorsement #SH-92506, and (c) without providing Plaintiffs any consideration for such a major reduction in coverage, ANPAC breached the insurance contract it had with Plaintiffs.

38. Additionally, when ANPAC, in paying Plaintiffs' 2018 storm damages claim, (a) paid only cash value for their roof replacement instead of full value roof replacement, and (b) depreciated the labor costs for removing the debris from Plaintiffs' home, ANPAC breached the insurance contract it had with Plaintiffs.

39. As a direct result of ANPAC's breach of contract Plaintiffs have suffered the loss of insurance benefits, mental and emotional distress, anxiety, embarrassment, and unexpected financial expenses and hardship. Accordingly, Plaintiffs seek damages for breach of contract and whatever other relief the Court may grant them against ANPAC.

## SECOND CLAIM FOR RELIEF
Fraud/Constructive Fraud

40. Plaintiffs incorporate all preceding allegations and information as if fully set forth herein.

41. ANPAC had a duty to fully inform Plaintiffs of the major reduction in roof insurance coverage changes ANPAC unilaterally made to their homeowners' insurance policy and to inform them of endorsement #SH-92506 under which they could re-purchase full replacement coverage (again) and maintain consistent homeowners' coverage.

42. However, ANPAC failed to ensure Plaintiffs were fully informed of the major changes and of endorsement #SH-92506, and it appears ANPAC's failure was intentional.

(a) ANPAC failed to ensure Plaintiffs received the 96 page "notice" of and understood the significant reduction in coverage changes it made to Plaintiffs' policy in 2014 and thereafter;

(b) ANPAC failed to provide sufficient notice to Plaintiffs, in clear and conspicuous language, of the significant reduction in coverage changes it made to Plaintiffs' policy in 2014 and thereafter. In fact, the language used in the 96 pages to "inform" Plaintiffs of the changes appears to have been intentionally placed so as to NOT call their attention to the changes; and

(c) ANPAC intentionally hid and withheld information that, although ANPAC was taking away their full replacement roof coverage in one stroke of the pen; due to yet another stroke Plaintiffs and other customers could purchase or re-purchase full roof replacement coverage at or near the very same time (if they had been properly and fully informed about it).

43. ANPAC's failure to fully inform Plaintiffs and intentionally (or even if unintentionally) hiding terms inside 96 pages of documents and otherwise withholding important information from them constitutes fraud or at least constructive fraud. For, the only reasonable conclusion for such actions by ANPAC is that it was done to gain an advantage over Plaintiffs' and keep their business (& money) and to have to pay out less on any claims in the future.

44. As a direct result of ANPAC's failure to fully inform, Plaintiffs have suffered the loss of insurance benefits, mental and emotional distress, anxiety, embarrassment, and financial hardship. Accordingly, Plaintiffs seek damages and punitive damages and whatever other relief the Court may allow them against ANPAC for fraud or constructive fraud.

**THIRD CLAIM FOR RELIEF**
Breach of the Duty of Good Faith and Fair Dealing

45. Plaintiffs incorporate all preceding allegations and information as if fully set forth herein.

46. Plaintiffs home was insured under a policy of insurance issued by Defendant ANPAC. In the State of Oklahoma insurance companies are bound by a duty of good faith and fair dealing with their insureds.

47. When ANPAC unilaterally changed Plaintiffs' insurance contract in **2014** from full replacement value roof coverage to cash value replacement coverage (a) without providing sufficient notice to Plaintiffs to call their attention to the changes, (b) without offering them the opportunity to choose (once again) to obtain full replacement coverage insurance under ANPAC's endorsement #SH-92506, and (c) without providing Plaintiffs any consideration for such a major reduction in coverage, ANPAC breached its duty of good faith and fair dealing with Plaintiffs.

48. When, after learning Plaintiffs had no knowledge of the unilateral change ANPAC had made to their policy, ANPAC still depreciated and only paid the cash value of

13

Plaintiffs roof when Plaintiffs' roof had to be fully replaced due to storm damage, ANPAC breached its duty of good faith and fair dealing with Plaintiffs.

49. Additionally, when ANPAC, in paying Plaintiffs' storm damages claim, (a) paid only cash value for their roof replacement instead of full value roof replacement, and (b) depreciated the labor costs for removing the debris from Plaintiffs' home, ANPAC breached its duty of good faith and fair dealing with Plaintiffs.

50. Being more specific about the Bad Faith acts of ANPAC towards Plaintiffs, the acts of ANPAC alleged herein in constitute or amount to:

    (a) Failing to pay Plaintiffs the benefits they are entitled to under the policy;

    (b) Intentionally withholding payment of benefits knowing that Plaintiffs claim was valid and they were in need of the money;

    (c) Unreasonably delaying payment of benefits without reasonable basis;

    (d) Unreasonably refusing to pay Plaintiffs' claim for reasons contrary to the express provisions of the policy and law;

    (e) Intentionally and recklessly misapplying provisions of the insurance policy and looking for ways to avoid paying some or all of Plaintiffs' claim;

    (f) Failing to properly investigate Plaintiffs' claim for benefits;

    (g) Failing to properly evaluate Plaintiffs' claim for benefits;

    (h) Failing to adopt and implement reasonable standards for the prompt investigation, evaluation and handling of claims arising under its policies, including Plaintiffs';

    (i) Unreasonably delaying Plaintiffs' claim and putting the burden of investigation and proof onto Plaintiffs and their attorneys;

    (j) Failing to attempt to act in good faith to effectuate a prompt and fair settlement of Plaintiff's claims;

    (k) Failing to ensure Plaintiffs received notice of and understood the unilateral and significant reduction in coverage changes it made to Plaintiffs policy in 2014 and thereafter;

    (l) Failing and/or intentionally refusing to provide sufficient notice to Plaintiffs, in clear and conspicuous language, of the significant reduction in coverage changes it made to Plaintiffs policy in 2014 and thereafter; and

  (m) Intentionally hiding and withholding information that, although ANPAC was taking away their full replacement roof coverage in one stroke of the pen; due to yet another stroke, Plaintiffs and other customers could have purchased or re-purchased full roof replacement coverage at or near the very same time (if they had been properly and fully informed about it).

51. As a direct result of ANPAC's breach of the duty of good faith and fair dealing, Plaintiffs have suffered the loss of insurance benefits, mental and emotional distress, anxiety, embarrassment, and financial hardship. Accordingly, Plaintiffs seek damages and punitive damages and whatever other relief the Court may allow them against ANPAC for its Bad Faith treatment of Plaintiffs.

## PUNITIVE DAMAGES

52. The intentional, wanton and reckless conduct of ANPAC in disregard of Plaintiffs' rights was conducted knowingly and willfully, in that ANPAC knew, or should have known, of the severe adverse consequences of their actions upon Plaintiffs and others.

53. ANPAC acted intentionally, maliciously, and/or in reckless disregard of the rights of Plaintiffs and others. Such actions were detrimental to Plaintiffs, and also to the class of potential plaintiffs.

54. Accordingly, Plaintiffs are entitled to recover punitive damages against and from ANPAC.

## RESPONDEAT SUPERIOR

55. Defendant ANPAC is a business entity that can only act through its officers, employees and other individual agents. Any act or omission of ANPAC's officers, employees or other agents is an act or omission of ANPAC.

56. Therefore, if any employee, officer or other agent of ANPAC is found to have harmed Plaintiff in any way as alleged herein, ANPAC is liable to Plaintiffs for their injuries and damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against ANPAC for an amount in excess of the amount required for diversity jurisdiction under §1332 of Title 28 of the United States Code, plus interest, costs, attorney fees, punitive damages and any other relief the Court deems appropriate.

JURY TRIAL REQUEST RESERVED.
ATTORNEY'S LIEN CLAIMED.

Respectfully submitted,

Jeffrey A. Martin, OBA# 15573
P.O. Box 18425
Oklahoma City, Oklahoma 73154
918.671.0841 Cell Phone
405.285.4624 Fax
jm8069337@aol.com

1/24/2020                                              Fwd: Insurance.

Subject: **Fwd: Insurance.**
Date: 7/1/2019 1:48:52 PM Central Standard Time
From: gsmith170@cox.net
To: jm8069337@aol.com

This was my premiums.

Begin forwarded message:

> **From:** JAY MARTIN <jaymartinanpac@msn.com>
> **Date:** July 1, 2019 at 12:06:30 PM CDT
> **To:** Gary Smith <gsmith170@cox.net>
> **Subject: Re: Insurance.**
>
> This is what I could gather. It is hard to see with some of the changes but I was going off of renewals so this should be close.
>
> 2005 - 763.00
> 2006 - 851.00
> 2007 - 753.00
> 2008 - 760.00
> 2009 - 1097.00
> 2010 - 1163.00
> 2011 - 2029.00
> 2012 - 2123.00
> 2013 - 2620.00
> 2014 - 2427.00
> 2015 - 2504.00
> 2016 - 2491.00
> 2017 - 2872.00
> 2018 - 3126.00
> 2019 - 3151.00
>
> Thank You
>
> Jay Martin American National Insurance
>
> *"One of the beautiful things about baseball is that every once in a while you come into a situation where you want to, and where you have to, reach down and prove something"* ............ *Nolan Ryan #34*

---

**From:** Gary Smith <gsmith170@cox.net>
**Sent:** Friday, June 28, 2019 3:34 PM
**To:** JAY MARTIN
**Subject:** Re: Insurance.



## American National Family of Companies

1949 East Sunshine
Springfield, Missouri 65899

DAVID_SMITH

DWELLING

### ROOF

| | QUANTITY | UNIT | TAX | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|

The following line items account for the replacement of all roofing material and accessories due to hail damage. Debris removal is included in the tear-off price. The existing roof is approximately 13 years old and in average condition.

1. Remove Tear off, haul and dispose of comp. shingles - Laminated

| | 43.63 SQ | 41.30 | 0.00 | 1,801.92 | 13/30 yrs | Avg. | 53% [%] | <955.02> | 846.90 |
|---|---|---|---|---|---|---|---|---|---|

2. Roofing felt - 15 lb.

| | 43.63 SQ | 22.77 | 11.68 | 1,005.14 | 13/20 yrs | Avg. | 53% [%] | <532.72> | 472.42 |

3. Laminated - comp. shingle rfg. - w/out felt

| | 50.33 SQ | 172.18 | 220.39 | 8,886.21 | 13/30 yrs | Avg. | 53% [%] | <4,709.69> | 4,176.52 |

4. R&R Flashing - pipe jack

| | 4.00 EA | 35.31 | 1.75 | 142.99 | 13/35 yrs | Avg. | 53% [%] | <75.79> | 67.20 |

5. Roof vent - turtle type - Plastic

| | 8.00 EA | 44.13 | 4.35 | 357.39 | 13/35 yrs | Avg. | 53% [%] | <189.42> | 167.97 |

6. R&R Rain cap - 4" to 5"

| | 4.00 EA | 30.29 | 2.82 | 123.98 | 13/35 yrs | Avg. | 53% [%] | <65.70> | 58.28 |

7. Ridge cap - composition shingles

| | 290.00 LF | 3.09 | 12.42 | 908.52 | 13/25 yrs | Avg. | 53% [%] | <481.51> | 427.01 |

8. Remove Additional charge for steep roof - 7/12 to 9/12 slope

| | 5.13 SQ | 10.37 | 0.00 | 53.20 | 13/NA | Avg. | 53% [%] | <28.20> | 25.00 |

9. Additional charge for steep roof - 7/12 to 9/12 slope

| | 5.13 SQ | 34.59 | 0.00 | 177.45 | 13/NA | Avg. | 53% [%] | <94.05> | 83.40 |

10. Remove Additional charge for steep roof - 10/12 - 12/12 slope

| | 35.49 SQ | 16.30 | 0.00 | 578.49 | 13/NA | Avg. | 53% [%] | <306.60> | 271.89 |

11. Additional charge for steep roof - 10/12 - 12/12 slope

| | 35.49 SQ | 54.38 | 0.00 | 1,929.95 | 13/NA | Avg. | 53% [%] | <1,022.87> | 907.08 |

Totals: ROOF                             253.41   15,965.24                                     8,461.57   7,503.67

### EXTERIOR/GENERAL

| | QUANTITY | UNIT | TAX | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|

12. Lightning protection system - Detach & reset

| | 1.00 EA | 310.98 | 0.00 | 310.98 | 0/NA | Avg. | 0% | (0.00) | 310.98 |

13. R&R Window screen, 10 - 16 SF

| | 2.00 EA | 48.48 | 3.99 | 100.95 | 0/30 yrs | Avg. | 0% | (0.00) | 100.95 |

FRONT AND LEFT ELEVATION DAMAGE



Exhibit 2
2 PAGES

**ADDITIONAL COVERAGES**

1. **Debris Removal.**

   We will pay up to an additional 5% of the Coverage A **limit of liability** for the reasonable expense you incur for the removal of debris of covered property due to a covered loss. We will also pay up to $1,000 in the aggregate for any one loss for reasonable expenses you incur for removal of fallen trees from the **residence premises** if:

   a. the tree damages covered property;
   b. the falling of the tree is caused by a Peril Insured Against under Coverage C; and
   c. this coverage is not provided elsewhere in this policy.

   Debris Removal does not apply to costs to:

   a. extract **pollutants** from land, air, or water;
   b. remove, restore, or replace land, air, or water which contains **pollutants**;
   c. tear out or remove material which is undamaged or partly undamaged unless removal of that material is necessary to repair or replace the damaged part. If it is necessary to remove undamaged material to make repairs, we will reimburse you for the reasonable costs you have necessarily incurred to remove the undamaged material; or
   d. remove roofing material whether damaged or undamaged unless the materials are no longer attached to the building structure and:

       (1) they were detached by a covered cause of loss; or
       (2) they were detached because they were necessarily removed in the course of repairing or replacing roofing materials which were damaged in a covered loss.

2. **Reasonable Repairs.** If a covered loss occurs, we will pay reasonable costs you incur for necessary repairs made solely to protect covered property from further damage. This coverage does not increase the applicable **limit of liability**.

3. **Trees, Shrubs, and Other Plants.** We will pay for loss to trees, shrubs, plants, or lawns on the **residence premises** and within 250 feet of the **dwelling**, when caused by any of the following Perils:

   a. Fire;
   b. Lightning;
   c. Explosion;
   d. Vandalism or malicious mischief;
   e. Riot or civil commotion;
   f. Aircraft;
   g. Vehicles not owned or operated by a resident of the **residence premises**; or
   h. Theft.

   We will not pay more than 5% of the Coverage A **limit of liability** for all trees, shrubs, plants, and lawns nor more than $750 for any one tree, shrub, or plant including removal expense. In no event do we cover property grown for **business** purposes.

4. **Fire Department Service Charge.** In case of a covered loss to which a fire department responds to protect covered property, we will pay up to $500 for your liability assumed by contract or agreement for fire department charges you incur. For this coverage, no deductible applies.

5. **Property Removed.** Covered property while being removed from a premises endangered by a covered peril and for not more than 30 days while removed is covered for direct loss from any cause. This coverage does not increase the **limit of liability** that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery, and Counterfeit Money.** We will pay up to $1,000 for:

   a. the monetary amount any **insured** is legally required to pay when a credit card or fund transfer card that has been issued in any **insured's** name has been stolen or used in an unauthorized manner. We do not cover use by a resident of your household, a person who has been entrusted with the credit card or fund transfer card, or any person if any **insured** has not complied with all terms and conditions under which the credit card or fund transfer card is issued;

SH-3.35 (9-14)                                10