## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DAVID GARY SMITH and )
LORI SMITH, *individually and* )
*on behalf of all others similarly situated,* )
       )
      Plaintiffs, )
       )
v. )    Case No. 20-CV-00115-GKF-CDL
       )
AMERICAN NATIONAL PROPERTY )
AND CASUALTY COMPANY, )
       )
      Defendant. )

## OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment [Doc. 30] and Motion to Strike Plaintiff's Expert Declaration [Doc. 39] of defendant American National Property and Casualty Company. For the reasons discussed below, the motion for summary judgment is granted in part and denied in part. The motion to strike is also granted in part and denied in part.

### Factual Background

The following facts are undisputed for purposes of the summary judgment determination.

In 2005, David Gary and Lori Smith (collectively, "the Smiths") purchased a homeowners insurance policy, designated policy no. 35-H-V64-786-2, from American National Property and Casualty Company (ANPAC). [Doc. 30, p. 8, ¶ 1; Doc. 34, p. 5, ¶ 1]. As issued in 2005, the Policy provided full replacement coverage for the roof of the Smith home. [Doc. 30, p. 8, ¶ 2; Doc. 34, p. 5, ¶ 1]. The Policy was renewed annually in 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013 and remained in effect during that time. [Doc. 30, p. 8, ¶ 3; Doc. 34, p. 5, ¶ 1].

In 2013, ANPAC mailed the Smiths a copy of their 2013 Policy renewal. [Doc. 30-1, p. 3, ¶ 4; Doc. 34, p. 5, ¶ 2]. The 2013 renewal included a "roof schedule" through a Policy endorsement. [Doc. 30-1, p. 3, ¶ 5; Doc. 34, p. 5, ¶ 2; Doc. 30-1, pp. 3, 61-63].

In 2014, the Policy again renewed.  [Doc. 30, p. 9, ¶ 9; Doc. 34, p. 5, ¶ 1].  Prior to the renewal in 2014, ANPAC mailed the Smiths a complete renewal packet, including several documents notifying the Smiths of changes in the Policy and a full copy of the 2014 Policy and endorsements (hereinafter, "2014 Renewal Packet").  [Doc. 30, p. 9, ¶ 10; Doc. 34, p. 6, ¶ 3; Doc. 30-1, pp. 3-4, ¶ 10; Doc. 30-1, pp. 66-103; Doc. 30-2, pp. 1-47].   The first page of the 2014 Renewal Packet states:

IMPORTANT INFORMATION
NEW POLICY ENCLOSED
ACTION REQUIRED

[Doc. 30, p. 9, ¶ 13; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 4, ¶ 13; Doc. 30-1, p. 66].   The second document in the 2014 Renewal Packet states, "This packet requires <u>ACTION</u> from you," and

✓ **Please review these items in your packet:**

- **"Thank you for your continued business . . ."** notice describing key changes to your policy

- Policy and endorsement coverage comparison

[Doc. 30, p. 9, ¶ 14; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 4, ¶ 14; Doc. 30-1, p. 68 (emphasis in original)].

The document also states:

✓ **Please contact us if you answer "yes" to any of the following:**

1. **Do you have any questions about your new coverage for wind and hail damage to roofs?**

   Your new policy could limit your coverage for wind or hail damage to your roof.

[*Id.*].  The "Thank you for your continued business" notice (the fifth and sixth pages of the 2014 Renewal Packet) is headed with the following:  "Your New Policy Includes Coverage Changes, Please Review!"  It includes the following:

- **Loss Settlement Changes for Roofs Damaged by Wind or Hail**

   o Your new policy adjusts the maximum amount we will pay for wind or hail damage to your roof depending on the age and construction of your roof, and **may not cover the full cost to repair or replace your roof if it is damaged by wind or hail**.  Please see The "Roof Payment Schedule" (Appendix A) in your policy.

   o **If your roof was installed more than 4 years ago**, please contact your agent to discuss how your roof coverage is affected by this change and other options that may be available.  Refer to your policy declarations to review and verify the documented year your roof was installed.

[Doc. 30, p. 10, ¶ 15; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 5, ¶ 15; Doc. 30-1, p. 70 (emphasis in original)].  The "Thank you for your continued business" notice also states:

> These and other changes are explained in greater detail in the "Policy and Endorsement Coverage Comparison" document included in this packet.
>
> We encourage you to thoroughly read your new policy.  All of the aforementioned changes take effect on the date shown on the enclosed renewal policy premium notice and are conditional upon payment of the amount due.
> Please contact your American National agent if you would like to discuss the changes to your policy or the many ways you can personalize your homeowners coverage.

[Doc. 30, p. 10, ¶ 15; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 5, ¶ 16; Doc. 30-1, p. 71].

The "Policy and Endorsement Coverage Comparison" form in the 2014 Renewal Packet begins as follows:

> The Oklahoma Special Homeowners Policy, **SH-3.35 (6-06)** (old policy) is being replaced by the Oklahoma American National Homeowners Policy, **SH-3.35 (6-13)** (new policy).
>
> The following explains the differences in coverage between your old policy and the new policy replacing it.  Among other changes, the new policy was reworded and reorganized to make it easier to read and understand.  This notice does not reference every change, including editorial changes or clarifications, made in your policy.

[Doc. 30, p. 10, ¶ 17; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 5, ¶ 17; Doc. 30-1, p. 74 (emphasis in original)].  The two introductory paragraphs are followed immediately by a heading stating "**POLICY COMPARISON HIGHLIGHTS**."  The first sub-section under that heading is entitled

"*I. REDUCTIONS IN COVERAGE*," Part C.1 of which relates to "PROPERTY COVERAGES," "COVERAGE A – DWELLING AND COVERAGE B – OTHER STRUCTURES."  [Doc. 30, pp. 10-11, ¶ 17; Doc. 34, p. 6, ¶ 3; Doc. 30-1, pp. 5-6, ¶ 17; Doc. 30-1, p. 74 (emphasis in original)]. The "COVERAGE A – DWELLING AND COVERAGE B – OTHER STRUCTURES" section includes the following:

> e.      In the new policy, replacement cost coverage will not apply to roofs when damaged by wind or hail.  Roofs damaged by wind or hail will now be covered according to a Roof Payment Schedule included in the policy which is based on the type and age of the roof.  Repair and replacement costs will include all costs and fees associated with the repair or replacement, including but not limited to materials, labor, removal, or demolition.  The old policy provided replacement cost.

[Doc. 30, p. 11, ¶ 17; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 6, ¶ 17; Doc. 30-1, p. 75].

Additionally, on or about June 2, 2014, four days before the effective date of the 2014 Renewal Policy (June 6, 2014), ANPAC mailed the Smiths a separate letter, which stated, in relevant part, as follows:

## Your coverage changed with your renewal.

***

**2.      New Loss Settlement Provisions for Roofs**

> The new policy now limits coverage for wind and hail damage to certain roofs depending on the location, age, and type of roof.  Your renewal packet explains how your coverage was affected.  Please call your agent if you do not understand how your roof is covered.

[Doc. 30, p. 11, ¶ 20; Doc. 34, p. 6, ¶ 4; Doc. 30-1, p. 7, ¶ 20; Doc. 30-2, p. 49].

The 2014 Policy Renewal took effect on June 6, 2014.  [Doc. 30-1, p. 101].  With respect to roofs damaged by windstorm or hail, the 2014 Renewal Policy stated as follows:

**3.      Loss Settlement for Roofs Damaged by Windstorm or Hail**

> In the event of a loss caused by windstorm or hail to the roof of a building

covered under Coverage A – Dwelling or Coverage B – Other Structures, we will pay the lesser of the following amounts:

a.     the amount actually spent to make necessary repairs or to replace the damaged roof;

b.     the applicable **limit of liability** shown in the **Declarations** for Coverage A – Dwelling if the loss is to the **dwelling** or Coverage B – Other Structures if the loss is to an **other structure**, regardless of the number of **other structures** damaged; or

c.     the applicable percentage of the cost to repair or replace the damaged part of the roof, based on the age and type of the roof as indicated in the Maximum Payment with Proof of Repairs column of Appendix A – Roof Payment Schedule located on page 27 of your policy.

However, we will pay the applicable percentage in the Initial Payment column, minus the applicable deductible, based on the age and type of roof as indicated in the Appendix A – Roof Payment Schedule, until actual repair or replacement is completed.  You must make claim within 180 days from the date of the initial payment amount for any additional liability due and payable up to the difference between the initial payment amount and the **limit of liability** determined to be the lesser of the options described in 3a, 3b, and 3c above.

Repair and replacement costs include all costs of materials, installation, removal, or demolition, including labor, taxes and fees associated with the repair or replacement of the roof and its components and accessories.

[Doc. 30, p. 12, ¶ 22; Doc. 34, p. 6, ¶ 3; Doc. 30-1, pp. 7-8, ¶ 22; Doc. 30-2, p. 14 (emphasis in

original)].  The 2014 Renewal Policy also included the following:

**ADDITIONAL COVERAGES**

1.     **Debris Removal**

We will pay up to an additional 5% of the Coverage A **limit of liability** for the reasonable expense you incur for the removal of debris of covered property due to a covered loss . . . .

Debris Removal does not apply to costs to:

\*\*\*

d.     remove roofing material whether damaged or undamaged unless the materials are no longer attached to the building structure and:

- 5 -

(1)    they were detached by a covered cause of loss; or

(2)    they were detached because they were necessarily removed in the course of repairing or replacing roofing materials which were damaged in a covered loss.

[Doc. 30, pp. 12-13, ¶ 23; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 8, ¶ 23; Doc. 30-2, p. 19 (emphasis in original)].  Appendix A of the 2014 Renewal Policy is a "Roof Payment Schedule."  [Doc. 30, p. 13, ¶ 24; Doc. 34, p. 6, ¶ 3; Doc. 30-1, p. 8, ¶ 24; Doc. 30-2, p. 36].

The Policy renewed in 2015, and ANPAC again mailed the Smiths a full copy of the Policy. [Doc. 30, p. 13, ¶ 25; Doc. 34, p. 7, ¶ 5; Doc. 30-1, p. 8, ¶ 25; Doc. 30-2, pp. 51-100].  The Policy renewed in 2016, 2017, and 2018.  In each of those years, ANPAC sent the Smiths copies of the declarations pages that included the following:  "FOR WIND AND HAIL LOSS, ROOF SETTLEMENT IS BASED ON THE ROOF PAYMENT SCHEDULE IN YOUR POLICY." [Doc. 30, p. 13, ¶ 26; Doc. 34, p. 7, ¶ 6; Doc. 30-1, p. 8, ¶ 26].  The Policy was in effect on June 7, 2018. [Doc. 30, p. 13, ¶ 27; Doc. 34, p. 5, ¶ 1].  The Smiths paid all of their applicable premiums for each Policy renewal from 2005 through 2018.  [Doc. 30, p. 13, ¶ 28; Doc. 34, p. 5, ¶ 1].

On June 7, 2018, the Smiths' home sustained storm damage which resulted in the roof needing to be replaced.  [Doc. 30, p. 13, ¶ 29; Doc. 34, p. 5, ¶ 1].  On August 16, 2018, the Smiths reported a claim to ANPAC for the alleged storm damage.  [Doc. 30, p. 13, ¶ 30; Doc. 34, p. 5, ¶ 1].  On or about August 17, 2018, ANPAC inspected the Smith residence.  [Doc. 30, p. 13, ¶ 31; Doc. 34, p. 5, ¶ 1].  On or about August 22, 2018, ANPAC generated an estimate for removal and replacement of the Smiths' roof.  The total of ANPAC's estimate was $7,199.59.  [Doc. 30, p. 14, ¶ 32; Doc. 34, p. 5, ¶ 1].  ANPAC paid the Smiths $7,199.59 for the roof damage claim.  [Doc. 30, p. 14, ¶ 33; Doc. 34, p. 5, ¶ 1].

**Procedural History**

On February 4, 2020, the Smiths initiated this case on behalf of themselves and all others similarly situated by filing a Class Action Petition in the District Court in and for Tulsa County, State of Oklahoma.  [Doc. 2-2].  On March 20, 2020, ANPAC removed the matter to this court. [Doc. 2].  The Second Amended Complaint, which is the operative pleading in this matter, includes allegations with respect to two separate classes, the first of which includes a subclass:  (1) Class #1, defined to include all persons or entities who were, prior to 2014, insured under a homeowners' insurance policy issued by ANPAC which included replacement cost coverage for roof damage claims, whose policies were purportedly changed by ANPAC in 2014 by removing replacement cost coverage for roof damage claims and replacing the same with reduced coverage, and who were purportedly notified of the Policy Change by ANPAC by delivery of the 2014 Renewal Packet; (2) Subclass A to Class #1, defined to include persons who meet the definition of Class #1, who made a claim for roof loss under their homeowners' policy after the purported policy change in 2014 and who were denied replacement cost coverage; and (3) Class #2, defined to include all persons or entities insured under a homeowners' insurance policy issued by ANPAC which included additional coverage for debris removal, who incurred labor costs for debris removal and had such costs reduced by ANPAC for depreciation.  [Doc. 19, pp. 14-15].

The Second Amended Complaint includes the following "counts":  (1) declaration of rights, (2) fraud, (3) breach of contract, and (4) breach of the duty of good faith and fair dealing. [Doc. 19].[1]  The "declaration of rights" count seeks a declaration that the "Purported Notice of Policy change was ineffective to change the Policy with respect to replacement cost coverage for

---

[1] The Second Amended Complaint also included a claim for violation of the Oklahoma Consumer Protection Act.  [doc. 19, pp. 12-13].  However, the Smiths dismissed the claim pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).  [Doc. 25].

roof claims and that the Policy provides, and provided at the time of Plaintiffs' loss in 2018, replacement cost coverage for roof claims." [Doc. 19, p. 11, ¶ 34]. The fraud count includes allegations that ANPAC deliberately misrepresented and concealed the reduction in coverage for roofs damaged by wind or hail to induce the Smiths to continue paying Policy premiums, regardless of the coverage provided. [Doc. 19, p. 12]. The breach of contract count asserts that ANPAC breached the insurance contract in two separate ways: (1) failing to pay replacement cost coverage benefits for the roof damage, and (2) paying depreciated coverage benefits for debris removal. [Doc. 19, p. 13, ¶ 51]. Finally, the breach of the duty of good faith and fair dealing count alleges that ANPAC breached its duty both in its handling of their insurance claim after the 2018 roof damage and in purporting to change the terms of the Policy. [Doc. 19, p. 14, ¶¶ 55-56].

On July 13, 2020, ANPAC filed the motion for summary judgment, which is limited to the Smiths' claims. [Doc. 30]. The Smiths responded in opposition [Doc. 34], and ANPAC filed a reply brief [Doc. 40]. Thus, the motion for summary judgment is ripe for the court's determination.

The same day it filed its reply in support of summary judgment, ANPAC filed the motion to strike, seeking to strike Exhibit 4 to the Smiths' summary judgment response. [Doc. 39]. That motion to strike has been fully briefed. [Doc. 41; Doc. 42].

**Motion to Strike Plaintiff's Expert Declaration [Doc. 39]**

Before considering ANPAC's motion for summary judgment, the court first addresses ANPAC's motion to strike the Declaration of Robert A. Leonard, Ph.D., which was attached as Exhibit 4 to plaintiffs' summary judgment response. [Doc. 39]. *See Johnson v. Weld Cnty.,* 594 F.3d 1202, 1210 (10th Cir. 2010) (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478 (10th Cir. 1995) ("[W]hile *Celotex* indicates that the *form* of evidence produced by a nonmoving party at summary judgment may not need to be admissible at trial, '*the content or substance* of the evidence

must be admissible.'").  Neither party requests a hearing on the motion.  *See generally* [Doc. 39; Doc. 41].  Based on the its review, the court concludes that the motion may be resolved on the briefs and that a hearing is not necessary.[2]

Pursuant to Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 imposes on the trial court an important gate-keeping obligation, "to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).  Thus, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho Tire Co., Ltd.*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).  To determine whether an expert's opinion is admissible, the district court must generally undertake a two-step analysis:  (1) first, to determine "whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion," and (2) second, to determine "whether the expert's opinion is reliable by assessing the underlying

---

[2] *Daubert* does not mandate a hearing and the decision whether to hold a hearing rests in the court's discretion.  *United States v. Nacchio*, 555 F.3d 1234, 1253-56 (10th Cir. 2009); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (*Daubert* hearing "is not specifically mandated").

reasoning and methodology[.]" *Mathis v. Huff & Puff Trucking, Inc.,* 787 F.3d 1297, 1307 (10th Cir. 2015) (internal quotations omitted). "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *Nacchio*, 555 F.3d at 1241.

ANPAC seeks to strike the Leonard Declaration based on three general arguments: (1) Dr. Leonard improperly opines as to an ultimate legal conclusion; (2) Dr. Leonard is not qualified by knowledge or experience to offer his opinions in this case; and (3) Dr. Leonard's testimony is unhelpful and unreliable. For ease of analysis, the court considers ANPAC's second and third objections to the Leonard's Declaration together.

> A.      *Improper Conclusions With Respect to an Ultimate Legal Issue*

As previously stated, ANPAC first criticizes the Leonard Declaration as impermissibly opining as to a legal conclusion—specifically, that ANPC did not provide the Smiths "clear and conspicuous notice" of changes to the 2014 Renewal Policy. Pursuant to Fed. R. Evid. 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, the Tenth Circuit has clarified that the Rule "refers to testimony on ultimate facts; testimony on ultimate questions of law, *i.e.,* legal opinions or conclusions, is not favored." *Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988)). Nor may an expert "state legal conclusions drawn by applying the law to the facts." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) (quoting *Okland Oil Co. v. Conoco Inc.,* 144 F.3d 1308, 1328 (10th Cir. 1998)). The court may "identify improper legal conclusions by determining whether 'the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular,'" and exclude such opinions. *United States v. McIver,* 470 F.3d 550, 562 (4th Cir. 2006); *see also United States v. Richter*, 796 F.3d 1173, 1196 (10th Cir. 2015); *SFF-TIR, LLC v. Stephenson,* 250 F. Supp. 3d

856, 1004 (N.D. Okla. 2017) ("Expert testimony is likely inadmissible when the expert's testimony tracks the language of the legal principle or statute at issue or when terms employed have a specialized legal meaning.").

ANPAC specifically objects to Dr. Leonard's opinions that ANPAC did not provide clear and conspicuous notice to the Smiths of the reduction of coverage for roofs damaged by a windstorm or hail.[3]  *See* [Doc. 34-4, pp. 7-9, 11-12, ¶¶ 18, 22-23, 26-29; *see also id*. at p. 1, ¶ 1 ("I have been retained to provide an expert opinion as to whether [ANPAC] provided clear and conspicuous notice to its policy holders, including David and Lori Smith, regarding a 2014 reduction in coverage for roof damage caused by wind and/or hail.")].   Whether an insurer provided adequate notice of a change to insurance coverage is generally a question of law for the court to determine.  *See Adams v. Greenwood,* 10 F.3d 568, 571 (8th Cir. 1993) ("The adequacy of the notice is a question of law, which the court may decide on summary judgment unless some predicate fact is in dispute."); *Am. Cas. Co. of Reading v. Res. Tr. Corp.,* No. CIV-92-1928, 1994 WL 361508, at *3 (E.D. Pa. July 6, 1994); *Benton v. Mut. of Omaha Ins. Co.,* 500 N.W.2d 158, 160 (Minn. Ct. App. 1993) (collecting cases) ("[C]ourts consistently have held that the factfinder determines whether notice was given, but the courts determine as a question of law whether a written notice was adequate."); *see also Gov't Emps. Ins. Co. v. United States,* 400 F.2d 172 (10th Cir. 1968); *Wynn,* 963 P.2d 572.

Here, no dispute exists as to the form of notice provided by ANPAC to the Smiths.[4]  Rather,

---

[3] As more fully set forth below, Oklahoma law imposes a duty on an insurer to "call attention to any changes in the policy."  *See Wynn v. Avemco Ins. Co.,* 963 P.2d 572, 574 (Okla. 1998).

[4] In their response to summary judgment, the Smiths do not dispute that ANPAC mailed any of the 2014 Renewal Packet and other correspondence, but do note that they "have no recollection of ever receiving any of the documents."  *See, e.g.,* [Doc. 34, p. 5 n.1].  Plaintiffs' statements that they "have no specific recollection of receiving any of the documents attached to ANPAC's

the Smiths dispute only whether the notice provided constituted "clear and conspicuous notice of the material coverage reduction at issue." *See* [Doc. 34, pp. 5-7 (noting no dispute existed as to the documents mailed by ANPAC to the Smiths or that the documents speak for themselves, but contesting the notice provided)].[5]  The adequacy of ANPAC's notice to the Smiths is therefore a question of law for the court to decide.  Accordingly, for purposes of the summary judgment determination, the court strikes and does not consider portions of the Leonard Declaration opining that ANPAC failed to provide "clear and conspicuous notice" of the coverage change.  *See Christiansen,* 332 F.3d at 1283; *see also Dabbs v. Shelter Mut. Ins. Co*., No. CIV-15-00148-D, 2019 WL 4747711, at *3 (W.D. Okla. Sept. 27, 2019).  The court therefore wholly strikes paragraph 29, and strikes all opinions directed to "clear and conspicuous" notice included in paragraphs 18, 22-23, 26-28 of the Leonard Declaration.[6]

---

Motion for Summary Judgment, [or] of receiving or reviewing any of the alleged notices set forth in [*sic*] herein" [Doc. 34-1, p. 1, ¶ 8; Doc. 34-2, p. 1, ¶ 8], are insufficient to create a genuine dispute of material fact as to the notice provided.  *See Mucha v. Vill. of Oak Brook,* 650 F.3d 1053, 1056 (7th Cir. 2011) (inconclusive testimony cannot, by itself, create a question of fact); *Hatfield v. Occidental Chem. Corp.*, 842 F.2d 1290, at *4 (4th Cir. 1988) (table decision) ("A party opposing a properly supported motion for judgment cannot create a genuine factual dispute simply by claiming that he does not recall a particular fact upon which the moving party has presented affirmative evidence.'); *Violetta v. Steven Bros. Sports Mgmt., LLC*, No. 16-1193-JTM, 2018 WL 2445177, at *5 n.1 (D. Kan. May 31, 2018) (same); *Kolish v. Metal Techs., Inc.,* No. 16-CV-00145-JMS-MJD, 2018 WL 1566810, at *9 (S.D. Ind. Mar. 30, 2018) ("A lack of recollection, however, is not sufficient to establish a genuine dispute of material fact."); *Am. Cas. Co. of Reading,* 1994 WL 361508, at *3.

[5] For this reason, *F.D.I.C. v. Am. Cas. Co. of Reading*—the District Court of Wyoming case cited by the Smiths for the proposition that whether notice is "clear and conspicuous" is a question of fact—is distinguishable.  814 F. Supp. 1032, 1034 (D. Wyo. 1991).  In that case, an issue of fact existed as to whether the insurance company provided the insureds a copy of the new endorsements prior to renewal.  *Id.*

[6] For similar reasons, the court does not consider the Smiths' sworn statement that they never received "clear and conspicuous notice from ANPAC that it intended to reduce the Policy's coverage."  *See* [Doc. 34-1, p. 2, ¶ 11; Doc. 34-2, p. 2, ¶ 11]; Fed. R. Evid. 701 (emphasis added) (lay testimony must be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a *fact* in issue")

B.      *Qualifications and Reliability*

ANPAC next challenges Leonard as unqualified and argues his Declaration is unreliable.

With respect to qualifications, ANPAC contends that Leonard is not qualified because he lacks any experience in insurance.  As previously stated, the court must determine whether Leonard is qualified by "knowledge, skill, experience, training, or education to render an opinion."  *Mathis,* 787 F.3d at 1307.   Based on a review of Leonard's *curriculum vitae*, the court concludes his experience and education are sufficient to qualify him as a general linguistics expert.   Dr. Leonard's lack of experience in the insurance field is the proper basis for cross-examination, not exclusion.  *See Bright v. Ohio Nat'l Life Assurance Corp.*, No. 11-CV-475-GKF-FHM, 2013 WL 121479, at *2 (N.D. Okla. Jan. 9, 2013).

Regardless of Leonard's qualifications, however, the court declines to consider the majority of Leonard's opinions because they are not helpful.  "The 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact." *Wilson v. Muckala,* 303 F.3d 1207, 1219 (10th Cir. 2002); *see also* Fed. R. Evid. 702(a) (emphasis added) ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence or to determine a fact in issue*.").  "When the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper." *Wilson,* 303 F.3d at 1219 (quoting *Frase v. Henry,* 444 F.2d 1228, 1231 (10th Cir. 1971)).

Leonard offers opinions as to whether ANPAC provided clear and conspicuous notice to its policyholders, including the Smiths, regarding a 2014 reduction in coverage for roof damage

caused by wind and/or hail.  As previously stated, no disputes of fact exist as to the notice provided and the issue of whether the notice provided was clear and conspicuous is a question of law for the court's determination.  Thus, Leonard's opinions are not helpful to determine a fact in issue.

The court strikes the remaining portions of paragraphs 18, 22-23, 26-28, as well as paragraphs 17, 19-21, and 25, as unhelpful because the court requires no assistance to read the language of the 2014 Renewal Packet.  *See Bright*, 2013 WL 121479, at *3.  The court is capable of noting the length of the packet, the presence or absence of an index or page numbers, emphasis to text such as bolding or underling, use of conditional or mandatory language, the appearance of specific terms, and the location of various provisions

However, the court declines to strike the analysis included in paragraphs 11-16 and 24 of the Leonard Declaration at this early stage of the litigation.  ANPAC challenges Leonard's methodology and opinions as unreliable under *Daubert*.  While the court must act as a gate-keeper, "courts must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997); *see also* Fed. R. Evid. 702 advisory committee notes to 2000 amendments (citing *Cortes*, 111 F.3d 184 as "discussing the application of *Daubert* in ruling on a motion for summary judgment") ("Courts have shown considerable ingenuity and flexibility in considering challenges to expert testimony under *Daubert,* and it is contemplated that this will continue under the amended Rule."); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000) ("A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance.").  Courts have specifically recognized the difficulties of applying

*Daubert* at the summary judgment stage, reasoning "given the complex factual inquiry required by *Daubert,* courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record.  Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage."  *Cortés-Irizarry*, 111 F.3d at 188.

Here, ANPAC filed its motion for summary judgment within four months of removal to this court.  Plaintiffs' Rule 26 expert disclosures are not due until January 29, 2021.  [Doc. 49].  The record has not yet been sufficiently developed for the court to rule on the remainder of ANPAC's *Daubert* challenges.  Accordingly, ANPAC's motion to strike the remainder of the Leonard Declaration is denied without prejudice to reassertion of the objections.

## Motion for Summary Judgment [Doc. 30]

As previously stated, ANPAC seeks summary judgment as to all of the Smiths' claims in this matter.  The court first considers the adequacy of the notice provided by ANPAC to the Smiths regarding the 2014 change in Policy coverage for roofs damaged by wind or hail, and then considers the propriety of summary judgment as to plaintiffs' claims premised on the change (declaratory relief, fraud, breach of contract, and bad faith).  Finally, the court considers plaintiffs' two claims—breach of contract and bad faith—premised on ANPAC's depreciation of debris removal.

### A.    *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

(1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)).

B.      *Notice of 2014 Change in Policy Coverage*

The duty of an insured to "read and know the contents of the [insurance] policy before he accepts it" is well-established under Oklahoma law. *Badgett v. Okla. Life Ins. Co.,* 54 P.2d 1059, 1062 (Okla. 1935). However, "[e]ven though the renewal of an insurance policy is a new contract, 'it is presumed, unless a contrary intention appears, that the parties intended' that the renewal policy cover the same terms, conditions, and exceptions as the original policy." *Wynn*, 963 P.2d at 574 (internal citation omitted) (quoting *Gov't Emps. Ins. Co*, 400 F.2d at 175-76). Thus, in the context of a renewal policy, it is clearly "the duty of *the insurance company* to call attention to any changes in the policy." *Id.* (emphasis added). Instructing or relying on the insured to "carefully read" the renewal policy is insufficient. *Gov't Employees Ins. Co*., 400 F.2d at 175; *Wynn,* 963

P.2d at 575; *see also* 2 Couch on Ins., *Inclusion of New Provisions* § 29:42 (3d ed. Dec. 2020 update) (internal footnote omitted) ("The law does not impose upon the insured under a renewal policy the duty to inspect such renewal policy, and failure of the insured to examine his or her new policy when it was delivered to him or her, which would have led him or her to discover an added clause, does not defeat recovery under the terms of the original policy where the insurer did not inform him or her that the renewal policy would in any way be different from the original.").[7]

Little Oklahoma case law exists regarding what constitutes adequate notice of a change in a renewal policy and thus the parties each rely heavily on the Oklahoma Supreme Court's decision in *Wynn*. In *Wynn*, Ralph Wynn requested "full coverage" when he first purchased an insurance policy from Avemco Insurance Company for his 1972 Piper Warrior. *Wynn,* 963 P.2d at 573. Wynn subsequently submitted a renewal application to cover the policy period from July 28, 1993 to July 28, 1994. *Id.* Unlike the original policy, the 1993-1994 renewal policy issued to cover the period from July 28, 1993 to July 28, 1994 period included an "in flight" exclusion that precluded coverage for damage to the aircraft that occurred "in flight." *Id.* Wynn submitted a claim under the 1993-1994 renewal policy for damage to the aircraft that occurred on August 28, 1993, but Avemco denied coverage based on the "in flight" exclusion. *Id.* at 573-74. Wynn filed a civil lawsuit asserting breach of contract and bad faith claims, and seeking reformation of the policy to provide "full coverage" including for "in flight" damage to the aircraft. *Id.* at 574.

In considering whether the policy should be reformed to eliminate the "in-flight" exclusion, the Oklahoma Supreme Court first established the rule that "it is the duty of the insurance company to call attention to any changes in the policy." *Id.* The court then discussed two cases it described

---

[7] For this reason, ANPAC's argument that it is entitled to summary judgment based solely on the insured's duty to read the Policy fails.

as factually similar:  *Government Employees Insurance Co. v. United States*, 400 F.2d 172 (10th Cir. 1968) and *Mundy v. Lumberman's Mutual Casualty Co.,* 783 F.2d 21 (1st 1986).  Accordingly, this court also considers those decisions.

In *Government Employees Insurance Co*., the insurer issued a liability insurance policy that included "the standard omnibus clause extending coverage to anyone responsible for the operation of the vehicle."  *Government Emps. Ins. Co,* 400 F.2d at 173.  Prior to the expiration of that policy, the insurer issued a renewal policy that "had attached separately thereto an endorsement excluding the United States as an additional insured."  *Id.*  "The cover letter transmitted with the new insurance contract advised the insured to read the new policy carefully."  *Id.*  In considering the validity of the additional insured endorsement, the Tenth Circuit set forth the "general rule that an insurance company is bound by the greater coverage in an earlier policy where the renewal contract is issued without calling to the insured's attention a reduction in policy coverage."  *Id*. at 175.  In so doing, the court recognized the premise of the rule "that an insurer who fails to call attention to policy changes is guilty of fraudulent or inequitable conduct or has committed an error, and in either event the insured, *who has relied on the assumption that the renewal contract provisions remained unchanged*, is entitled to recover as though there had been no modification in the policy coverage."  *Id.* (emphasis added).  Applying these general principles to the insurance contract at issue, the Tenth Circuit concluded:

> In this case the insurer, GEICO, transmitted a new policy contract and instructed the insured to carefully read the contract as submitted.  This alone is insufficient to call attention to the change in coverage.  However, when coupled with the fact that the endorsement excluding the United States was attached as a separate addition to the contract, it becomes apparent that even a casual reading of the mailed material would result in informing the insured of the change.  Hence, while it is inequitable to require an insured to search the fine print of each renewal policy, to require that he be aware of a short, separately attached boldly worded modification, seems clearly appropriate.

*Id.* (internal footnotes omitted).

The First Circuit applied similar principles in *Mundy.* 783 F.2d 21 (1st 1986). In *Mundy*, the insurer originally issued a policy that included no limits for loss by theft of silverware, but issued a renewal policy limiting recovery for silver theft to $1,000. *Id.* at 22. When the insured's home was burglarized and the insurance company refused to pay more than $1,000 for stolen silver, the insureds sued arguing that the insurer did not given them adequate notice of the change in the renewal policy. *Id.* The First Circuit disagreed. *Id.* The court noted undisputed evidence that the insureds received the policy, and the jacket (inside cover) included the following in capital letters: "THIS IS A NEW EASY TO READ POLICY. PLEASE READ YOUR POLICY. THERE ARE SOME COVERAGE CHANGES. IF THERE ARE ANY QUESTIONS, CALL YOUR AGENT OR THE COMPANY RIGHT AWAY." *Id.* Included in the jacket were sixteen pages, the fourth of which was a one-page summary of the changes made in the renewal policy. *Id.* "Each change noted in the summary [was] in a separate paragraph, set off from the others by added space and black dots." *Id.* The relevant paragraph stated, "[t]heft of silverware and guns is now limited to $1,000. Should you wish more coverage for such items, contact your agent." *Id.* Additionally, the court noted that the policy itself set forth the $1,000 limitation "in readable English in good-sized print" under the heading "'Special Limits of Liability,' set off in boldface type." *Id.* Based on the foregoing, adequate notice was provided. *Id.*

Applying these decisions, in *Wynn*, the Oklahoma Supreme Court concluded:

> In the present case, Wynn was sent a notice of the expiration of the old policy and renewal application. The application for renewal instructed Wynn to check the coverage for accuracy. On the front page, the renewal application conspicuously showed that the policy did not cover "in-flight" damage to the aircraft. Wynn completed the application and returned it to Avemco without commenting on the "in-flight" exclusion.

> Standing alone, an instruction to check for accuracy may be insufficient to call

> attention to an exclusion.  However, when coupled with the fact that the "in-flight" exclusion is clearly and conspicuously stated on the front page of the renewal application and the policy, there can be no misconception that the policy excludes "in-flight" damage to the aircraft even if covered under the original policy.

*Wynn,* 963 P.2d at 574-75.  The court further stated that, "[w]hile an insured is not required to search the fine print for changes," under the circumstances, it was not inequitable to require the insured to be aware of the "in-flight exclusion."  *Id.* at 575.  This was true even if the agent had represented to Wynn that the policy was full coverage as "the renewal application and the policy should have put Wynn on notice of the 'in-flight' exclusion."  *Id.*

From these cases, the court gleans the following general principles.  *First,* under Oklahoma law, it is the duty of the insurer to clearly and conspicuously "call attention to any changes in the policy."  *Wynn,* 963 P.2d at 574.  *Second,* the premise underlying the duty is equitable, requiring that an insured "who has relied on the assumption that the renewal contract provisions remained unchanged" be entitled to recover as though no modification occurred.  *Government Emps. Ins. Co.*, 400 F.2d at 175.  *Third*, the insured cannot be required to "search the fine print" for changes, and transmitting a new policy contract alone with instructions to carefully review is insufficient.  *Id.*; *Wynn,* 963 P.2d at 575.

Applying these principles, the court concludes that ANPAC provided adequate notice of the 2014 Policy changes regarding roofs damaged by hail or wind under Oklahoma law.  It is undisputed that the first page of the 2014 Renewal Packet states:

IMPORTANT INFORMATION
NEW POLICY ENCLOSED
ACTION REQUIRED

[Doc. 30-1, p. 66].  The following page was blank but the next page, the third in the packet, is titled, "This packet requires <u>ACTION</u> from you."  [Doc. 30-1, p. 68 (emphasis in original)].  The title is set apart from the other text, and placed at the top of the page in large, bolded font.  [*Id.*].

The "This packet requires <u>ACTION</u>" document is generally formatted in two columns.  The first is titled "Please review these items in your packet," which is set apart by a check-mark symbol and the text is in bolded, enlarged font.  [*Id.*].  The section directs the insured to review the "Thank you for your continued business . . . ." notice and the "Policy and endorsement coverage comparison."  [*Id.*].  The second column is titled "Please contact us if you answer 'yes' to any of the following," which is also set apart by a check-mark symbol and the text is in bolded, enlarged font.  [*Id.*].  Immediately under the sub-title, the first question—which is designated and set apart by the numeral 1—asks "Do you have questions about your new coverage for wind and hail damage to roofs?" and states "[y]our new policy could limit your coverage for wind or hail damage to your roof."  [*Id.*].  Thus, this first informational page provides notice of potential changes to the Policy's coverage for roof damage caused by wind or hail.

The "This packet requires <u>ACTION</u> from you" page is immediately followed by a blank page, then the two-page "Thank you for your continued business . . ." notice.  [Doc. 30-1, p. 70].  The first page of the notice includes three bulleted subheadings, each in bolded, enlarged font.  The second subheading is "Loss Settlement Changes for Roofs Damaged by Wind or Hail," and is immediately followed by:

> o  Your new policy adjusts the maximum amount we will pay for wind or hail damage to your roof depending on the age and construction of your roof, and **<u>may not cover the full cost to repair or replace your roof if it is damaged by wind or hail</u>**.  Please see The "Roof Payment Schedule" (Appendix A) in your policy.
>
> o  **If your roof was installed more than 4 years ago**, please contact your agent to discuss how your roof coverage is affected by this change and other options that may be available.  Refer to your policy declarations to review and verify the documented year your roof was installed.

[*Id.*].  This "Thank you for your continued business . . . ." notice again alerted the Smiths to

potential changes in coverage for roofs damaged by wind or hail—specifically, that the Policy may not provide full replacement cost coverage.  [*Id.*].  Through the notice, APAC also specifically stated that coverage depended on the age and construction of the roof, and suggested that insureds whose roofs were installed more than 4 years ago contact their agent.  [*Id.*].

The "Policy and Endorsement Coverage Comparison" begins on the 2014 Renewal Packet's ninth page.  That form states that "[t]he Oklahoma Special Homeowners Policy, SH-3.35 (6-06) (old policy) is being replaced by the Oklahoma American National Homeowners Policy, SH-3.35 (6-13) (new policy)," and describes the purpose of the document to "explain[] the differences in coverage between your old policy and the new policy replacing it."  [Doc. 30-1, p. 74].  Significantly, the "Coverage Comparison" form includes the subtitle "REDUCTIONS IN COVERAGE," which is set apart in capitalized letters in enlarged, bolded font.  It is also set apart by the Roman numeral "I."  [*Id.*].  The subsection proceeds in outline format, with changes in various types of coverages (*i.e.,* property, liability, etc.) differentiated by capitalized letters.  Changes to "Coverage A. – Dwelling"–applicable to roof damage—are set out in section C.1.  In subsection C.1, each change is in a separate paragraph, set apart from the others by a lower case letter and spacing.  [*Id.* at pp. 74-75].  Paragraph "e." states as follows:

> e.  In the new policy, replacement cost coverage will not apply to roofs when damaged by wind or hail.  Roofs damaged by wind or hail will now be covered according to a Roof Payment Schedule included in the policy which is based on the type and age of the roof.  Repair and replacement costs will include all costs and fees associated with the repair or replacement, including but not limited to materials, labor, removal, or demolition.  The old policy provided replacement cost.

[Doc. 30-1, p. 75].  Thus, under the sub-title "Reductions in Coverage," paragraph e. explicitly informed the Smiths that the Policy no longer provided replacement cost coverage, and that, instead, coverage would depend on the type and age of the roof.  [*Id.*].  Finally, the court further

- 22 -

notes that the revised Policy language, reflecting the change, was included in the copy of the renewal Policy provided to the Smiths.  [Doc. 30-2, p. 14].

The court further notes that, in addition to the 2014 Renewal Packet, it is undisputed that, on June 2, 2014, ANPAC sent David Smith additional correspondence regarding the renewal policy.  [Doc. 30-2, p. 49].  The June 2 correspondence began with the statement, "Your coverage changed with your renewal," which was in an enlarged font.  [*Id.*].  The correspondence includes a short summary of some of the changes included in the renewal, each set out in separate, numbered paragraphs.  Under the designation "**2.  New Loss Settlement Provisions for Roofs**," the June 2 letter states:

> *The new policy now limits coverage for wind and hail damage to certain roofs depending on the location, age, and type of roof.*  Your renewal packet explains how your coverage was affected.  Please call your agent if you do not understand how your roof is covered.

[Doc. 30-2, p. 49 (emphasis added)].  Thus, the June 2, 2014 correspondence again notified the Smiths that the 2014 Renewal Policy "limit[ed] coverage" for wind and hail damage, depending on the age and type of roof.[8]

Viewing the undisputed evidence as a whole, the court concludes that ANPAC sufficiently called attention to changes in the Policy's coverage for roofs damaged by wind or hail.  As set forth above, the 2014 Renewal Packet and June 2, 2014 correspondence do more than merely instruct the Smiths to carefully read the renewal policy.  Rather, the documents provided explicit notice of the change in coverage for roofs damaged by wind or hail based on age and roof-type.  In fact, the 2014 Renewal Packet specifically notes potential changes to the coverage in three separate documents, including the first informational page of the packet (the "This packet requires

---

[8] The Smiths describe the paragraph as "[b]uried in the middle of the letter."  [Doc. 34, p. 13]. However, as explained above, plaintiffs' description is not borne out by review of the letter itself.

ACTION from you" document).  *See Wynn,* 963 P.2d at 575.

Additionally, and of great significance to this court, under the bolded and capitalized heading "**REDUCTIONS IN COVERAGE**," the "Policy and Endorsement Coverage Comparison" form explicitly explained that, in the 2014 renewal Policy, "replacement cost coverage will not apply to roofs when damaged by wind or hail.  Roofs damaged by wind or hail will now be covered according to a Roof Payment Scheduling included in the policy which is based on the type and age of roof."  [Doc. 30-1, p. 75].  Likewise, the June 2, 2014 letter made clear that the 2014 renewal policy "limits coverage for wind and hail damage to certain roofs depending on the location, age, and type of roof."  [Doc. 30-2, p. 49].  Rather than having to scour through the fine print of the Policy, ANPAC alerted the Smiths of the change under headings set off in boldface type.  This is sufficient.  *Mundy,* 783 F.2d at 22.

Based on the 2014 Renewal Packet and June 2, 2014 correspondence, the Smiths should have been on notice that the 2014 renewal policy provided reduced coverage for roofs damaged by wind or hail based on age and roof-type.  *See Wynn,* 963 P.2d at 575.  That is, there could be no misconception that the renewal Policy provided the same coverage for wind and hail damage to roofs as the original Policy, and the Smiths could not have reasonably relied on the assumption that the Policy's coverage for such damage remained unchanged.  *Id.*; *Gov't Emps. Ins. Co.*, 400 F.2d at 175.

The Smiths offer several criticisms of the notice provided by ANPAC, none of which are persuasive.  As a general matter, many of the Smiths' criticisms are specific to individual documents included in the 2014 Renewal Packet, but, as set forth above, the court has construed the 2014 Renewal Packet as a whole.  While any one of the documents alone may be insufficient[9],

---

[9] The court offers no opinions as to the sufficiency of any of the individual documents.

when viewed together, ANPAC provided sufficient notice.  *See Wynn,* 963 P.2d at 575.

Additionally, the Smiths object to ANPAC's use of the phrases "new coverage" and "new policy" as ambiguous.  However, the first page of the 2014 Renewal Packet states "NEW POLICY ENCLOSED" [Doc. 30-1, p. 66].  The 2014 Renewal Packet then defines "new policy," [Doc. 30-1, p. 74], and explicitly states in large, bolded lettering: "Your New Policy Includes Coverage Changes, Please Review!"  [Doc. 30-1, p. 70].  When read in context, it is clear that "new coverage" and "new policy" refer to the 2014 Renewal Policy.  Further, the references to "new policy" are not inaccurate as, under Oklahoma law, "the renewal of an insurance policy is a new contract."  *Wynn*, 963 P.2d at 574.  Finally, the court notes that, while, as a practical matter, it might be a better practice to refer to the "renewal" policy or coverage, rather than "new" policy, that a better practice may exist does not render ANPAC's notice inadequate.  *Gov't Emps. Ins. Co.*, 400 F.2d at 175 n.12.

The Smiths also argue that notice was inadequate because the "This packet requires ACTION from you" form and "Thank you for your continued business . . . ." notice use conditional language—*i.e.*, "[y]our new policy *could* limit your coverage" [Doc. 30-1, p. 68 (emphasis added)], and "[y]our new policy . . . *may not* cover the full cost to repair or replace your roof if it is damaged by wind or hail."  [Doc. 30-1, p. 70 (emphasis changed from original)].  However, as set forth above, the "Policy and Endorsement Coverage Comparison" document explicitly states "**replacement cost coverage will not apply to roofs when damaged by wind or hail**."  [Doc. 30-1, p. 75].  The "Coverage Comparison" document provides further clarification by stating that "[r]oofs damaged by wind or hail will now be covered according to a Roof Payment Schedule included in the policy which is based on the type and age of the roof."  [*Id.*].  The change in coverage was reiterated in the June 2, 2014 correspondence, which again set out that coverage for

wind and hail damage to roofs would depend on the age, type, and location of the roof. [Doc. 30-2, p. 49]. Further, the "Thank you for your continued business" notice directs the Smiths to the "Roof Payment Schedule," designated as Appendix A to the Policy, which sets forth the applicable payment schedule and from which the Smiths could determine the maximum payment for their roof with repairs.[10] [Doc. 30-1, p. 70]. ANPAC therefore clearly and conspicuously called the Smiths' attention to changes in the Policy as required by Oklahoma law.[11] *Wynn,* 963 P.2d at 574.

Next, the Smiths contend that the 2014 Renewal Packet—and specifically the "Policy and Endorsement Coverage Comparison" document—is inconsistent on its face because it uses conflicting language and fails to sufficiently alert the reader to the importance of the information through use of bolded, italicized, or underlined text. *First*, the language is not inconsistent. The "Coverage Comparison" document explains that the new (renewal) Policy does not provide replacement cost coverage, but does not state that the Policy will not pay *any costs* to repair or replace roofs damaged by wind or hail. The notice simply defines what costs may fall within the reduced coverage provided. Second, the Smiths' criticism of the notice as lacking bolded, italicized, or underlined text overlooks that the Renewal Packet must be viewed as whole. As

---

[10] The Smiths criticize ANPAC for not providing "relevant page numbers or other identifiable information." [Doc. 34, p. 10]. However, the notice clearly refers to the Schedule as "Appendix A," which appears in bolded lettering at the top, center of the relevant form. This is sufficient, particularly as the Policy itself—which was also provided to the Smiths—notes the relevant page numbers.

[11] The court further notes that the conditional language is, in fact, consistent with the Policy. Pursuant to the 2014 Policy, ANPAC would pay the lesser of the (a) the amount actually spent to make necessary repairs or to replace the damaged roof; (b) the applicable limit of liability shown in the Declarations; or (c) the applicable percent of the cost to repair or replace the damaged part of the roof, based on the age and type of the roof as indicated in the maximum Payment with Proof of Repairs column of Appendix A – Roof Payment Schedule. [Doc. 30-2, p. 14]. Pursuant to the Schedule, insureds whose roof had been installed within the last four (4) years could recover 100% of the cost to repair or replace the damaged roof. [*Id.* at p. 36].

discussed above, in two additional documents, ANPAC utilized bolded text and bulleting to emphasize the coverage change.  Even if the court were to focus on the "Policy and Endorsement Coverage Comparison" document, it adequately alerts the insured to the change as the relevant language is set apart through use of lettering and spaces from the other text and, further, appears under the bold and capitalized subtitle "**REDUCTIONS IN COVERAGE**."

Finally, the Smiths criticize the 2014 Renewal Packet and June 2, 2014 letter as failing to adequately explain that change would result in a 53% reduction in coverage *to them*.  That is, the Smith would require ANPAC to provide a notice that thoroughly *explained* the import of the change to each individual insured.  However, the Smiths direct the court to no Oklahoma case law imposing such a stringent requirement.  Rather, Oklahoma law requires only that the insurer clearly and conspicuously "*call attention* to any changes in the policy."  *Wynn,* 963 P.2d at 574.  For the reasons set forth above, ANPAC adequately called attention to the change in coverage for roofs damaged by wind or hail.  Further, in multiple locations in its correspondence to the Smiths, ANPAC encouraged them to contact their agent with any questions.  While simply providing a copy of the policy and directing the insured to contact an agent with questions may be insufficient under Oklahoma, *Gov't Emps. Insurance Co*., 400 F.2d at 175; *Wynn,* 963 P.2d at 575, the Smiths direct the court to no Oklahoma law prohibiting the insurer from providing clear and conspicuous *notice* of policy change in addition to directing the insured to their agent for further *explanation*.[12]

Insofar as the Smiths cite to cases outside of Oklahoma to require a more comprehensive notice, the cases are factually distinguishable and therefore not persuasive.  In *Shelter Mutual*

---

[12] In this same vein, the Smiths also argue that the *Policy language itself* is difficult to comprehend and therefore does not provide adequate notice.  However, for all the reasons set forth herein, ANPAC does not rely solely on the Policy language, but instead provided the 2014 Renewal Packet and June 2, 2014 letter summarizing the changes.

*Insurance Co. v. Mid-Century Insurance Company*, 246 P.3d 651 (Colo. 2011), the Colorado Supreme Court disapproved of what it characterized as a "general" notice that advised only that some changes may affect coverage, not that coverage was reduced in the renewal policy. *Id.* at 658. To determine how the policy had changed, the insured "would have had to have placed his original policy against his renewal policy, and, line by line, tried to ascertain those changes." *Id.* at 659. Here, as previously stated, ANPAC explicitly informed the Smiths that the 2014 Renewal Policy did not provide replacement cost coverage and therefore may not cover the full cost to repair or replace roofs damaged by wind or hail, including a notice under the bolded and capitalized subtitle, "**REDUCTIONS IN COVERAGE**." In *Skeete v. Dorvius*, the insurer sent the insured "an essentially undifferentiated passel of two hundred documents," which was insufficient, but the New Jersey Supreme Court noted that the outcome "might well have been different" if the "insurer sent the cover letter with the three page notice outlining the changes separately." 875 A.2d 859, 861 (N.J. 2005). Here, ANPAC included a cover letter outlining the significant changes, as well as following up with the June 2, 2014 letter. For this and the reasons discussed above, the 2014 Renewal Packet cannot fairly be characterized as an "essentially undifferentiated passel" of documents. In *North River Insurance Company v. Young*, the notice implied that the policy language had increased, rather than decreased. 453 S.E.2d 205, 210 (N.C. Ct. App. 1995). As discussed above, no similar policy language exists in this case. For similar reasons, *Fields v. Blue Shield of California,* 209 Cal. Rptr. 781, 786 (Cal. Ct. App. 1985), *Davis v. United Services Automobile Association*, 273 Cal. Rptr. 224, 230-31 (Cal. Ct. App. 1990), and *Campbell v. Insurance Service Agency*, 424 N.W.2d 785, 790 (Minn. Ct. App. 1985), are not persuasive as ANPAC adequately identified the change as a policy reduction. Nor is *Giles v. St. Paul Fire & Marine Insurance Company* is factually analogous as ANPAC did not provide the Smiths

incomplete or misleading information.  405 F. Supp. 719 (N.D. Ala. 1975).

Under Oklahoma law, ANPAC was obligated to clearly and conspicuously "call attention to any changes in the policy." *Wynn,* 963 P.2d at 574.  ANPAC adequately did so.  Thus, it is not inequitable to require the Smiths to be aware of the change in coverage for roof damage due to wind and hail, and no grounds for reformation of the Policy exist.  *Id.* at 575.  The Smiths are bound to the language of the 2014 Policy as written and ANPAC is entitled to summary judgment as to the Smiths' claim for declaratory judgment.

C.     *Plaintiffs' Claims Premised on Inadequate Notice of Policy Change*

ANPAC also seeks summary judgment as to plaintiffs' remaining claims:  (1) fraud, (2) breach of contract, and (3) breach of the duty of good faith and fair dealing.  As set forth above, the Smiths' breach of contract and bad faith claims are premised on two separate theories: (1) failure to pay replacement cost coverage benefits for the roof damage, and (2) paying depreciated coverage benefits for debris removal.  In this section, the court considers the breach of contract and bad faith claims only to the extent premised on failure to pay replacement cost coverage benefits for the roof damage.

1.     Fraud

As previously stated, the fraud claim alleges that ANPAC deliberately misrepresented and concealed the reduction in roof coverage to induce the Smiths to continue paying Policy premiums, regardless of the coverage provided.  [Doc. 19, p. 12].  However, for the reasons set forth above, ANPAC neither misrepresented nor concealed the change in the Policy's coverage.  Because the undisputed facts demonstrate that ANPAC did not make a false, material misrepresentation, ANPAC is entitled to summary judgment in its favor as to the Smiths' fraud claim.  *See Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009) (emphasis added) (actionable fraud under Oklahoma

law requires proof of the following elements:  "1) *a false material misrepresentation*, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment").[13]

2.   <u>Breach of Contract</u>

Insofar as it is premised on ANPAC's failure to pay replacement cost coverage benefits for the roof damage, the Smiths' breach of contract claim fails.  As stated above, the Smiths are bound to the 2014 Policy language as written.  Pursuant to the 2014 Policy, ANPAC would pay the lesser of the (a) the amount actually spent to make necessary repairs or to replace the damaged roof; (b) the applicable limit of liability; or (c) the applicable percent of the cost to repair or replace the damaged part of the roof, based on the age and type of the roof as indicated in the maximum Payment with Proof of Repairs column of Appendix A – Roof Payment Schedule.  It is undisputed that ANPAC paid the Smiths $7,199.59 for the roof damage claim.  The Smiths submit no evidence that the payment was not the lesser of the amount actually spent to make necessary repairs or

---

[13] In their summary judgment response, the Smiths include a request that the court deny or defer ruling until after discovery pursuant to Fed. R. Civ. P. 56(d).  "In the Tenth Circuit, a non-movant requesting additional discovery under Rule 56(d), 'must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment.'"  *Gutierrez v. Cobos*, 841 F.3d 895, 908 (10th Cir. 2016) (quoting *Birch v. Polaris Indus., Inc.,* 812 F.3d 1238, 1249 (10th Cir. 2015)).  The one-page, six paragraph declaration of plaintiffs' counsel is insufficient.  Plaintiffs' counsel asserts he "anticipate[s] discovery will reveal that ANPAC *deliberately* designed the 2014 Renewal Packet to obfuscate the reduction at issue," but offers no probable facts not available to support the assertion.  [Doc. 34-6 (emphasis in original)].  Nor does plaintiff's counsel set forth what steps have been taken to obtain those facts or how additional time will enable plaintiffs to obtain them.  Thus, the Smiths' request for additional discovery pursuant to Fed. R. Civ. P. 56(d) must be denied.  *Birch,* 812 F.3d at 1249-50; *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993) (The Rule "may not be invoked by the mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.").

- 30 -

replace the damaged roof, the applicable limit of liability, or the applicable percent cost to repair or replace the roof pursuant to Appendix A.  Accordingly, no genuine dispute of fact exists as to whether ANPAC breached the insurance contract by failing to pay replacement cost coverage for the damaged roof.  *See Cates v. Integris Health, Inc*., 412 P.3d 98, 103 (Okla. 2018) (under Oklahoma law, the elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach").

### 3.   Breach of the Duty of Good Faith and Fair Dealing

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured and . . . the violation of this duty gives rise to an action in tort." *Christian v. Am. Home Assurance Co.,* 577 P.2d 899, 904 (Okla. 1977).  The essential elements of a bad faith claim are as follows:  "(1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co*., 221 P.3d 717, 724 (Okla. 2009).  "Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law." *Beers v. Hillory*, 241 P.3d 285, 293 (Okla. Civ. App. 2010); *see also Barnes v. Okla. Farm Bureau Mut. Ins. Co*., 11 P.3d 162, 170-71 (Okla. 2000) ("[B]ad faith cannot exist if an insurer's conduct was reasonable under the circumstances.").  For the reasons set forth above, ANPAC provided adequate notice of the change in the Policy's coverage such that the Smiths are bound by the language of the 2014 Policy.  Further, ANPAC has issued payment under the Policy.  No genuine dispute of fact exists as to the adequacy of payment under the 2014 Policy language.  Thus, ANPAC's actions were reasonable under the circumstances and bad faith cannot exist.

Moreover, even if the Smiths were not bound to the language of the 2014 Policy, an insurer's denial of coverage is not unreasonable or in bad faith when a legitimate dispute regarding coverage exists.  *See Ball,* 221 P.3d at 725 ("If there is a legitimate dispute concerning coverage . . . withholding or delaying payment is not unreasonable or in bad faith."); *see also Manis v. Hartford Fire Ins. Co.,* 681 P.2d 760, 762 (Okla. 1984) ("A [bad faith] cause of action will not lie where there is a legitimate dispute.").  Even if the Policy was not effectively amended, that result would not result in bad faith as a matter of law, as an insurer does not act in bad faith when it legitimately disputes coverage.  *See Lindsay v. Nat'l Lloyds Ins. Co*., No. CIV-08-1131-D, 2010 WL 1329754, at **6-7 (W.D. Okla. Mar. 29, 2010); *see also Roesler v. TIG Ins. Co.,* 251 F. App'x 489, 506 (10th Cir. 2007) ("Oklahoma law does not require the insurer's position in a dispute to be correct to avoid liability.  Even if the jury finds for the plaintiff on the dispute and renders a verdict for breach of an insurance contract, this does not mean the insurer acted in bad faith.").  Thus, ANPAC is entitled to summary judgment in its favor on the Smiths' bad faith claim to the extent premised on ANPAC's failure to pay replacement cost coverage for the damage to the roof.

> D.    *Claims for Payment of Depreciated Coverage Benefits for Debris Removal*

As previously stated, the Smiths also assert breach of contract and breach of the duty of good faith and fair dealing claims premised on ANPAC's payment of depreciated debris removal costs.  In its summary judgment motion, ANPAC argues only that the plain language of the Policy unambiguously allowed it to apply the Roof Schedule Reduction to labor costs to remove the Smiths' old roof prior to installation of the new roof.  In response, the Smiths point to the Policy's Additional Coverages – 1. Debris Removal.  Pursuant to that provision, debris removal coverage does not apply to the costs to "remove roofing material whether damaged or undamaged unless *the materials are no longer attached to the building structure*," and (1) they were detached by a

extent premised on depreciation of debris removal costs, is unwarranted.

## Conclusion

WHEREFORE, defendant American National Property and Casualty Insurance Company's Motion for Summary Judgment [Doc. 30] is granted in part and denied in part. The motion is granted as to plaintiffs' request for declaratory judgment and fraud claim, as well as plaintiffs' breach of contract and breach of the duty of good faith and fair dealing claims to the extent premised on failure to pay replacement cost coverage for the roof damage. The motion is otherwise denied.

ANPAC's Motion to Strike Plaintiff's Expert Declaration [Doc. 39] is granted in part and denied in part. The motion is denied as to paragraphs one through sixteen of the Declaration of Robert A. Leonard, Ph.D. The motion to strike is otherwise granted.

IT IS SO ORDERED this 22nd day of December, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE